Sutton v. Morgan et al., Appellants.

*Vendor and vendee—Misrepresentations—Rescission—Costs.*

A sale of land will be rescinded where it appears that the vendee was induced to purchase the land at twice its value by false representations of the vendor's agents to the effect that there was a large demand for building lots on the land, that a railroad company was about to move its shops to the neighborhood, that a syndicate of prominent capitalists had been formed to secure the land, and that a certain large sum had been offered for it.

If in such case plaintiff acts upon the representations without making any inquiry whatever as to their truth, he is guilty of such gross carelessness as will deprive him of his costs in the equity suit to rescind the contract.

Argued Oct. 9, 1893. Appeal, No. 264, Oct. T., 1893, by defendants, Benjamin W. Morgan et ux., from decree of C. P. Beaver Co., Sept. T., 1891, No. 1, in favor of plaintiff, R. S. Sutton, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Bill to rescind contract for sale of real estate.

The case was referred to Andrew S. Miller, Esq., as master, who recommended that the bill be dismissed.

Exceptions to the master's report were sustained by the court in the following opinion by WICKHAM, P. J. :

" In the year 1880, Mrs. Martha B. Morgan bought for the price of $18,500 a farm in Economy township, Beaver county, lying on the Ohio river, and cut in two by the Pittsburgh, Fort Wayne & Chicago Railway. The farm contained one hundred and forty acres and some perches of land. The Morgans sold to the railway company seven and forty-four hundredths acres, and, in the year 1889, placed the remainder of the farm on the market at the price of $30,000. An active and efficient real estate broker was employed to make the sale, but all his efforts proved unavailing. He was to receive five per cent commission if he effected a sale.

" In the fall of 1890, one J. Clark Williams, a school-teacher of Pittsburgh, and without any means, got it into his head that he would lay out a town, after the manner of the founders of

Charleroi and similar places near Pittsburgh, and grow rich suddenly. He sent a scout, one Heiner, down the Ohio river to find a site for the contemplated town. Heiner returned and told Williams about the Morgan farm. The next day B. W. Morgan, the husband of Martha B. Morgan, appeared on the scene in Pittsburgh, and negotiations commenced. The price asked for the farm at this time, by Mrs. Morgan, was forty thousand dollars.

" According to the overwhelming weight of the evidence, the property was not then, or at any time since, worth, for any purpose, more than thirty thousand dollars. Some of the witnesses, especially those who live near by and have, under peculiar circumstances, sold strips of land to the railway company at fancy prices, seem to think otherwise. It is not unjust to these witnesses to say, that they have inflated ideas of the value of their property, and that they are more or less unconsciously influenced by a desire to keep up the prices of the real estate they yet own. It is a noticeable fact that, while the plaintiff called a number of experienced real estate brokers of the neighborhood to testify to the value of the farm, the defendants did not put a single person of this class on the stand. It may also be added that the learned master, who is a resident member of the bar of Allegheny county, is probably less able to correctly determine what weight should be given to the testimony of the witnesses who testify as to value, than is the writer of this opinion, who is either personally acquainted with every witness who has testified on the subject, or well knows his character, peculiarities and means of knowledge.

" Williams started out in that frame of mind which made it an easy matter to delude him, and it is clear, from the evidence, that Morgan, who visited him very often, did not limit himself merely to exaggerated praise of his wife's farm. He told Williams, among other things—some of them not so important— that the shops of the Pittsburgh, Fort Wayne & Chicago Railway Company were about to be removed to the neighborhood. This was stated, not as a matter of conjecture or opinion, but substantially as a fact which he, Morgan, had ascertained from competent sources. Any one reading the evidence cannot help being convinced that the intention of Morgan and Glass, Mrs. Morgan's other agent, was to satisfy Williams that the

removal of the shops had been determined upon, and that, therefore, it was not worth his while to inquire farther into the matter, as he might and doubtless would have done, if it had been put at him in the shape of a mere rumor or report floating about in the community.

" During the time Morgan was making these representations, he well knew that Williams was unable to buy the property himself, and that he would be compelled to secure partners or backers. When Williams was on the witness stand he was asked the following questions : ' Q. Now state whether or not when he, Morgan, called at your place you mentioned to him that you had presented this property to certain parties ? A. I presume I did ; I think we talked the matter over and said that there were several parties talking of it. Q. And you mentioned the parties ? A. I am not sure whether I told him the names as to who they were and all that ; we talked the matter over, as there was a possibility, at least, of organizing a company and making a sale of the property. Q. Didn't he state to you to go on and dispose of it, if you could ? A. He didn't object to our purchasing the property ; I don't know that he said to go on and sell it, directly in those words, but it was understood that I would probably organize a land company and sell the property to the land company.' Under these circumstances Morgan must be held to have contemplated and intended that the representations he made to Williams would be repeated by the latter to any person or persons whom he might seek to induce to buy the property with him. As Williams well says in his testimony, in answer to a question : ' Mr. Morgan made the representations to me that I made to Doctor Sutton, and to any other person with whom I talked with regard to that farm, and, of course, it did not require any special authority from him to repeat those representations that he made.' Morgan loaded the gun with the hope and expectation that it would be used against some one for his wife's benefit, and I think that she, under the circumstances of the case, is as liable as one whose agent issues a false prospectus or advertisement, expecting and hoping that some one, he knows not and cares not whom, will be deceived thereby.

" In the month of January, 1891, or earlier, the Morgans employed J. E. Glass, a Pittsburgh real estate broker, to sell

the farm for $53,500, agreeing to give him $1,300 as a commission in case he proved successful. His efforts to sell at this or any other figure were futile. In April of the same year, Glass obtained from the Morgans a five days' option on the farm, with a view to organize a syndicate and sell the property to it for $75,000, to wit: Twenty-five thousand dollars in cash, a mortgage for $40,000, and $10,000 stock in the company to be formed. The Morgans, it seems, were to receive as their share the cash and the mortgage, while Glass was to get the $10,000 in stock for his services. Glass was unable to organize the syndicate, and the option expired on April 19, 1891. He continued, however, to act as agent for Mrs. Morgan, at the same time keeping the syndicate matter in view, until the sale was made to the plaintiff, and, as will be seen hereafter, he rendered very efficient service in aiding her to make that sale by his false and misleading statements to Williams.

"On May 1, 1891, Williams for the first time approached Doctor R. S. Sutton, the plaintiff, a practicing physician in the city of Pittsburgh, and managed to interest him in the Morgan farm, the price whereof had been raised from forty thousand dollars in October, 1890, and fifty-three thousand and five hundred dollars in January, 1891, to what the master properly terms the 'magnificent' price of sixty-five thousand dollars. Nothing had occurred in the meantime to enhance the real or apparent value of the land, if we except the misrepresentations of Morgan and Glass, made from time to time to Williams, who was their dupe from beginning to end.

"All that had been told Williams was eagerly and enthusiastically detailed by him to Sutton on the day of their meeting. Sutton having to go to Washington, D. C., was unable then to visit the property (indeed he never saw it until after it was bought), and empowered Williams to represent them both, if a purchase were to be made. Three days later, namely, on the 4th of May, 1891, Sutton being then in Washington, Morgan visited Williams and learned from him that Sutton was to be his partner and financial backer. As has been said before, Morgan knew all along that Williams had no money wherewith to purchase. On this occasion Morgan repeated his statements, that the shops would certainly be removed, and also added, in substance, that a syndicate, consisting of Robert Pitcairn, a

prominent official of the Pennsylvania Railroad Company, living in Pittsburgh, Hon. George F. Huff, a capitalist of Greensburg, and others, had been formed or was practically organized, and about to buy the farm for seventy-five thousand dollars; 'that they were about to close the matter,' and all that was wanting now was Mr. Huff's presence, he being temporarily absent, and that he would be home in a day or two and close the deal. Williams, knowing Glass's relation to Mrs. Morgan, at once hastened to see him. Glass confirmed Morgan's statements and embellished the same. To quote from Mr. Williams's testimony, ' Mr. Glass said he had a friend on the inside with the Fort Wayne board, and that he expected any hour to have information that the shops had been officially removed—ordered to be removed to Conway.' He, Glass, also added that the capital stock of the syndicate was fixed at one hundred thousand dollars, and that Mr. Huff had agreed to take five shares at fifteen thousand dollars each. All of which was news to Mr. Huff when he was questioned as a witness in this case.

" The effect of these statements on the already infatuated Williams can be best described by an extract from his own testimony. The question was asked him: ' Was it on the strength of this conversation with Glass, and this information of the syndicate, as you had learned partly, that you sent this telegram to Doctor Sutton? A. Certainly; that and Mr. Morgan's representations in the same connection. I felt that the property was about to be sold for seventy-five thousand dollars, that the railroad shops were about to be located; that the property had been advanced from $53,600 to $65,000, on a good financial basis. Owing to these facts, and taking the whole in consideration all through, I felt certain that we were safe in making a purchase of that kind, and counted on a good large profit for Doctor Sutton and myself in the deal. Had I not expected to realize handsomely on it I should never have taken the trouble to go into it.' The important fact should be borne in mind that when these representations were made Morgan had been informed, by Williams, that Sutton was to be connected with the purchase, and therefore Mrs. Morgan and her agents would be responsible for the representations made to Williams, as if they were made to Sutton directly. Sutton was still absent in Washington. Williams asked for an option of a few

days, to which Morgan replied that ' he would not give anybody an option for three or four hours.' Williams, excited by the fear of losing what he supposed to be a great bargain, and not being able to pay even the one per cent of the sixty-five thousand dollars, demanded as hand money, sent the following telegram to Sutton at Washington : " Pittsburgh, Pa., May 4, 1891. To Doctor R. S. Sutton, Arlington Hotel, Washington, D. C. Pitcairn offers $75,000. I need $600 to close at $65,000. Can you wire it ? J. Clark Williams.' As Williams explains in his testimony, he used Pitcairn's name because he understood he was the head of the syndicate. Sutton, who, from his previous conversation with Williams, had learned something of the proposed syndicate, understood the meaning of this telegram. He arranged, by telegraph, for the needed money ; and on the following day, to wit, May 5, 1891, a preliminary agreement was drawn up and signed by Morgan for himself and wife, and Williams for himself and Sutton. On May 6th a more formal agreement was prepared and signed by Morgan and wife and Williams, a blank space being left for Sutton's name. The latter executed the agreement on his return from Washington. By an understanding between Sutton and Williams, the deed was made to the former alone. This was done so that the lots in the contemplated town, could be more easily and cheaply conveyed to the expected purchasers. On the 11th of July, 1891, Sutton having become satisfied that Williams was utterly unable to furnish either money or influence towards developing the farm, repaid him the trifling sum he had advanced, and Williams stepped out.

" That Morgan and Glass made the statements attributed to them is absolutely certain. They do not deny it. Morgan evades, Glass refuses to testify. That these representations were the main inducing causes that led to Sutton's purchase, is clear from the evidence and is not seriously disputed; that the statements were false is equally clear; that they were intended to deceive and excite Williams is quite apparent to any one who reads the evidence. Neither Morgan nor Glass had any right or reason to make the statements concerning the removal of the shops and about the syndicate in the manner wherein such statements were made. They were calculated to deceive and did deceive. Without these misrepresentations, no

sale would have ever been accomplished.    Perhaps no better or more ingenious mode could have been adopted for backing up the false assertion that the removal of the shops might be expected at any hour, than the equally false syndicate story to the effect that the Pitcairns, Huff and others intended making immediate purchase of the farm at an immense price.    Naturally, Williams and Sutton would conclude that the removal of the shops must have been certainly determined on, when prominent railroad men and capitalists connected with them were, seemingly, so eager to buy.

" Glass's part in the whole matter is particularly reprehensible.    No sooner had he got through helping to put Sutton in the toils, where, as was supposed, he was inextricably involved, than he, Glass, concluded to do a stroke of business on his own account, and made an attempt to extort five thousand dollars from the man whom he had already victimized.    This was sought to be accomplished through a dishonest use of the option, which had expired more than two weeks before Sutton bought the farm, and at the best was never enforceable against Mrs. Morgan, she not having acknowledged it.    When put on the stand as a witness for the plaintiff, Glass insolently refused to testify.    He was not called for the defence.

" In a few months, Sutton discovered the deception which had been practiced upon him.    He then promptly tendered a reconveyance for the land, which was refused.    With the exception of some unimportant changes, made before he discovered the fraud, and which the master very properly finds can be compensated for, the farm remained and yet remains the same as when purchased.    Unless equity affords no remedy to a man who, through fraudulent artifice, has been led to agree to pay sixty-five thousand dollars for a property, not reasonably worth the one half of that sum, the court is clearly of the opinion that the plaintiff is entitled to relief.

" It must be kept in mind that a proceeding to rescind a contract, induced by fraud, is governed by a different rule than that which is invoked in an action for damages, for deceit.    In Leake on Contracts, 3d ed., 1892, 292, it is said : ' A misrepresentation thus made, for the purpose of inducing an agreement, is described in law as fraudulent, but in actions or proceedings taken to avoid an agreement, so obtained, it is sufficient to al-

lege the facts and circumstances which render the agreement voidable in law, without alleging or proving as a fact a fraudulent motive or intention beyond that of obtaining the agreement.' Again, on page 309, the same author says: 'But an untrue representation, made with belief of its truth, though it may be sufficient ground for avoiding a contract obtained upon the faith of it, is insufficient to support a substantive action of deceit for damages against the party making it, because, in order to support such action at common law it is held necessary that the false statement should be made fraudulently; that is, at least, without an honest belief in its truth.'

"In Kerr on Fraud and Mistake, 68, it is said: 'It may be material, where proceedings at law are aimed against a man, with a view to obtain damages from him personally for false representations, that he may have believed statements made to him by agents to be true, but it is immaterial where the transaction is sought to be set aside.' On the same subject Mr. Wharton, in his work on Contracts, vol. 1, sec. 214, states the doctrine as follows: 'As is elsewhere shown, a party is as reponsible in an action for deceit for a reckless misstatement of a matter of which he had no knowledge as he would be for a deliberate statement which he knew to be false. But the misrepresentations now before us are neither fraudulent nor reckless, but are honest misstatements, which the party making believed to be true. They do not expose him, therefore, to an action for deceit though they avoid a contract to which they led. On this topic, therefore, we may hold to the following position: A contract assented to by one party on the faith of material misrepresentations by the other party will be rescinded at the option of the party injured, although the misrepresentations were made neither fraudulently nor negligently.' See also Bower v. Fenn et ux., 90 Pa. 359, wherein it was held that, 'If Bower chose to permit Fenn to contract with him on the faith of his statements of value, he was bound not merely to believe, but to know, that they were true.' But, in the opinion of the court, actual fraud has been shown in the case in hand.

"The master intimates, also, that the plaintiff and Williams were culpably negligent in not inquiring into the truth of the representations made by Mrs. Morgan's agents. On this point it has been well said, 'However negligent the party may have

been to whom the incorrect statement has been made, yet that is a matter affording no ground of defence to the other. No man can complain that another has relied too implicitly on the truth of what he himself stated:' Kerr on Fraud and Mistake, 81; Bower v. Fenn et ux., supra.

"The master in speaking of the syndicate matter says : ' That the source of his, Morgan's, information, was mainly Mr. J. E. Glass, a real estate agent in Pittsburgh, who had undertaken to effect a sale of the property. That Mr. Glass had represented to Morgan he was about to effect a sale to a syndicate ; that for the purpose of effecting this sale Morgan had given Glass an option upon this property, and that Glass had stated to Morgan that the syndicate was about to close the sale and was only prevented from doing so by the absence of Senator Huff. The master is of opinion that Morgan believed the statements of Glass, and that there were reasonable grounds for his so believing.' What were the reasonable grounds? At the most, the statements of Glass, his wife's reckless agent, whose option, as Morgan told Williams, he had refused to extend, and would not extend for even three or four hours. If he believed, or half believed, that Glass had formed, or was in a fair way of forming, such a company as he, Morgan, told Williams of, would he have hesitated a moment to extend the option? Why did he not inquire of Robert Pitcairn, or some other reputable man, said to belong to the syndicate, whom he could have seen in ten minutes, before. repeating the falsehood he says Glass told him? Had he any confidence in the story of the syndicate? If he had, then we must believe that this shrewd man was willing to throw away a certainty of getting, in a day or two, from men of the highest financial standing, the same price that Williams and Sutton agreed to pay, with twenty-five thousand dollars, instead of fifteen thousand dollars thereof, practically payable in hand. The court finds it impossible to believe that Morgan had faith in the tale he told Williams with such positiveness. I need hardly comment on the seeming disinterestedness of Glass, who cheerfully told and did everything that would promote a sale to Williams and Sutton, out of which he was apparently to get nothing, thus destroying his own chances of making ten thousand dollars out of the deal with the syndicate. No one can deny that Glass was willfully and deliberately falsifying. But

the master entirely ignores the fact, properly found by himself, that Glass was also Mrs. Morgan's agent; and the further facts that he had for months been trying to sell the farm at different prices and in different ways, and that on May 4, 1891, after Williams had revealed the connection between himself and Sutton, Glass made representations to Williams directly. Indeed, as has been said before, Glass's statements on this occasion were even more elaborate than Morgan's. He explains just why he was sure of the removal of the shops, namely, because 'he had a friend on the inside of the Fort Wayne board, and that he expected any hour to have information that the shops had been officially removed—ordered to be removed to Conway.' He also stated just how many shares Huff had agreed to take in the syndicate and their exact value. On the faith of the statements, made by both of Mrs. Morgan's agents, on the date last mentioned, Williams sent the telegram which led Sutton to enter into the contracts and advance the first payment of purchase money on that day. I cannot agree with the learned master, that statements of this sort are mere matters of opinion or conjecture. They were not given as matters of opinion or conjecture. Moreover, they were uttered falsely and for a fraudulent purpose, which they accomplished, and Mrs. Morgan should be held responsible for them in this proceeding.

"Apropos of Mr. Huff's connection with the syndicate, well styled by the master as a 'company in nubibus,' Huff's deposition shows that he never gave the matter any thought at all; did not even know where the farm was situate, and that he never had any communication or connection with Glass. Furthermore, he leaves it doubtful whether A. O. Tintsman, who shared Glass's office and seems to have been aiding him in his speculations, ever mentioned the farm to him until after Williams and Sutton had purchased it. Huff farther contradicts Tintsman's statement that he wrote him, Tintsman, about the property.

"It is hardly necessary to cite authorities to show that Mrs. Morgan cannot hold on to the fruits of a bargain brought about by her agents' fraudulent representations. The law on this subject is briefly and succinctly stated in Leake on Contracts, 318. It is also well established that, if any one material representation relied on was false, equity will relieve, although

such representation may not have been the sole inducing cause of the contract. As is said in Kerr on Fraud and Mistake, 74: 'It is not, however, necessary that the representations should have been the sole cause of the transaction. It is enough that it may have constituted a material inducement. If any one of several statements, all in their nature more or less capable of leading the party to whom they are addressed to adopt a particular line of conduct, be untrue, the whole transaction is considered as having been fraudulently obtained, for it is impossible to say that the untrue statement may not have been precisely that which turned the scale in the mind of the party to whom it is addressed. A man who has made a false representation in respect to a material matter must, in order to be able to rely on the defence that the transaction was not entered into on the faith of the representation, be able to prove to a demonstration that it was not relied on. It is not enough for him to say that there were other representations by which the transaction may have been induced. Nor can he be heard to say what the other party would have done had no misrepresentation been made.'

" Standing alone, perhaps the syndicate story would be insufficient to justify interference, but connected as it was with the representation as to the removal of the shops, it made the latter statement appear highly credible and thereby doubtless exercised an important influence.

" Thus far the discussion has been confined to the fraud alleged in the bill. Let us now assume that neither actual nor constructive fraud on the part of Mrs. Morgan's agents has been sufficiently proved, and turn to the question of mistake. The following positions are undoubtedly sustained by the evidence : (1) That Williams and Sutton would never have bought the farm, for any purpose, had they not believed that the railroad shops were about to be removed to its vicinity, that is, that the removal was imminent. (2) That such removal would double the value of the farm, as the master suggests, if not finds, in his tenth finding of fact. (3) That the railway company did not even contemplate the removal.

" Taking the most favorable view, so far as the vendors are concerned, that the facts will fairly allow of, and conceding that all the parties to the transaction honestly believed that such removal was imminent, and for that reason alone looked

on the property as a town site, estimated and determined the number of lots into which it could be subdivided, and by reason of these things valued the land at sixty-five thousand dollars instead of thirty thousand dollars, its true value, and that all their dealings were influenced and controlled by the paramount mistake as to such removal, it is not going too far to say that equity should put the parties to the contract, whose eyes are now opened, back in their original situation. The vendors would not have had the hardihood to ask such a price for the farm, if they had not believed or pretended to believe that some unusual and extraordinary event was about to happen which would radically change the character and business of the neighborhood, and convert the farm into a place suitable and necessary for a town. Nor would the purchasers, in their sober senses, have bought at such a price, unless they were acting under a mistake."

As authority for rescission on the ground of mistake the court cited: Goettel v. Sage, 117 Pa. 299; Johnston's Ap., 114 Pa. 132; Babcock v. Day, 104 Pa. 4; Reigel v. Am. Life Ins. Co., 140 Pa. 193; 153 Pa. 134.

The court entered a decree rescinding the contract of sale and imposing all of the costs upon defendants, who thereupon appealed.

*Errors assigned* were in sustaining exceptions to the master's report, and in entering decree, quoting them.

*A. B. Hay* and *A. Blakeley, A. M. & W. A. Blakeley* with them, for appellants, cited: Campbell v. Patterson, 95 Pa. 447; Smith v. Brush, 1 Johns. Ch. 459; Lawrence v. Dale, 3 Johns. Ch. 23; Pearsoll v. Chapin, 44 Pa. 9; Negley v. Lindsay, 67 Pa. 217; Leaming v. Wise, 73 Pa. 173; Morgan v. McKee, 77 Pa. 228; Veasey v. Doton, 3 Allen, 380; Smith v. Richards, 13 Peters, 42; Slaughter v. Gerson, 13 Wallace, 383; Farnsworth v. Duffner, 142 U. S. 47; Mahaffey v. Ferguson, 156 Pa. 156; Jennings v. Broughton, 5 De G., M. & G. 126; Phipps v. Buckman, 30 Pa. 401; Lynch's Ap., 97 Pa. 349; Scully v. Miller, 29 Leg. Int. 230; Glasier v. Rolls, 42 L. R. 436; Rockafellow v. Baker, 41 Pa. 319; Bugbee's Ap., 110 Pa. 331; Thompson's Ap., 103 Pa. 603.

*John P. Blair* and *A. H. Clarke, E. B. Dougherty* with them, for appellee, cited: Story's Eq. Pl. 2d ed., § 853; Eaton's Ap., 66 Pa. 483; R. R. Co.'s Ap., 3 Penny. 164; Spencer & Newbold's Ap., 80 Pa. 317; Dilworth v. Bradner, 85 Pa. 238; Cox v. Highley, 100 Pa. 249; Hunt v. Moore, 2 Pa. 108; Tyson v. Passmore, 2 Pa. 124; Spalding v. Hedges, 2 Pa. 240; Pennock v. Tilford, 17 Pa. 459; Fisher v. Worrall, 5 W. & S. 478; Watts v. Cummins, 59 Pa. 84; Pearsoll v. Chapin, 44 Pa. 9; Doggett v. Emerson, 3 Story, 700; Hugusnin v. Baseley, 14 Ves. Sr. 275; Harris v. Tyson, 24 Pa. 360; Hunt v. Moore, 2 Pa. 109; Williams v. Kerr, 152 Pa. 560; Herman on Estóppel, 1st ed. 333; Danzeisen's Ap., 73 Pa. 71; Wilhelm's Ap., 79 Pa. 121; Neale v. Neale, 9 Wallace, 6; Hardin v. Boyd, 113 U. S. 756; Graffam v. Burgess, 117 U. S. 180; The Tremolo Patent, 23 Wallace, 518; Sproull's Ap., 71 Pa. 137; Adam's Ap., 113 Pa. 449; R. R. v. Cooper, 33 Pa. 278.

OPINION BY MR. JUSTICE WILLIAMS, November 6, 1893:

The plaintiff sought and obtained in the court below the rescission of a contract made by him with Mrs. Morgan for the purchase of her farm near Remington station on the Pittsburgh, Ft. Wayne & Chicago Railroad. The ground on which his right to relief was placed was that the execution of the contract by him had been induced by fraudulent misrepresentations, made to him by Mrs. Morgan's agents, particularly by her husband and John E. Glass, largely through J. C. Williams, who was a co-purchaser of the land and whose interest therein was now held by the plaintiff. The master found that the negotiations were conducted between Williams and Morgan; and that the representations made by Morgan and Glass to him were repeated by Williams to Sutton, and induced the purchase by him. He finds that several of these representations were in fact false. Among them are the following: The thirty-four acres lying between the railroad and the river, amounting to nearly one third of the farm, were represented as suitable for building lots, and above the reach of ordinary floods. The master finds that most of this land could be made suitable for building only by filling. It was represented that extensive railroad yards were being opened in the immediate neighborhood of this farm, and that there was at the time these

negotiations were going on an active demand for lots on this farm. The master finds that no such demand existed. It was represented that the car shops of the railroad company were to be moved to the neighborhood of this farm, and that men connected with the road had declared that it was their purpose to make another city there, like Altoona. This was not true. It was represented that a syndicate of men connected with the railroad company had been formed, and that an offer of seventy-five thousand dollars had been made for the farm on their behalf, payable sixty-five thousand dollars in cash and mortgage, and ten thousand dollars in the stock of the land company to be formed by the purchasers. The master found that no syndicate had been formed or offer made. Under the influence of these representations the plaintiff was led to buy the farm at sixty-five thousand dollars. The master finds that it was at the time worth not more than thirty thousand dollars, " unless for speculative purposes ; " but he does not find what its speculative value was, nor is it easy to see how the speculative value could have been much in advance of its actual value for business purposes, since no operations were in progress or in contemplation calculated to enhance its value in the near future. But the master. found further that Morgan believed the representations he made to be substantially true, and that there was no fraudulent combination between Morgan and Glass, or Morgan and Williams, to defraud Sutton, and for this reason recommended a decree dismissing the bill.

The learned judge who sat as chancellor in this case differed from the master in relation to the character of the representations made by Morgan. He found the fact to be that Morgan had no reasonable ground for belief that the shops of the railroad company were about to be removed, or that a syndicate of men connected with the company had been formed for the purchase of his wife's farm, or that he had been offered by such men, or any one on their behalf, the sum of seventy-five thousand dollars or any other sum for it. He further found that the representations made by Glass to Williams in regard to the same subjects, viz., the removal of the shops, the existence of the syndicate, and the offer on its behalf of seventy-five thousand dollars for the farm, were false ; that Glass knew them to be untrue when he made them ; and that they were made to

aid Morgan in effecting a sale by stimulating Williams, and through him those whom he represented, to conclude a contract at once before the syndicate would be ready to make the advance payment and take the property. He thus reversed the master's finding as to the good faith of the representations made by both Morgan and Glass, and reached the conclusion that the contract of sale was procured by representations that were untrue, and known to be untrue by those who made them. Upon the findings of fact so modified he declined the decree recommended by the master, and held the plaintiff entitled to the relief prayed for.

This appeal from the decree so made requires us to examine the evidence so as to determine whether the conclusions of the master, or of the court below, should be adopted. This examination we have made, and we are led by it to concur with the learned judge in his findings and conclusions. The master found that Sutton agreed to pay more than twice the actual value of the farm; that he did this under the belief that the representations, made to Williams and communicated by him, were true; and that these representations were not true. The learned judge concurs in these findings, and so far there is no room for doubt. The evidence however sustains the judge in the further finding that both Morgan and Glass knew their statements, in regard to the removal of the shops, the existence of the syndicate of men connected with the railroad, and the offer of seventy-five thousand dollars by that syndicate for the farm, were not true; and that these statements were made to raise delusive expectations of gain, and to hasten the making of a purchase by Williams and the person whom he represented. It is said that Williams should have inquired for himself, and that his opportunities of obtaining information were just as good as those of Morgan. This may be. Prudence should have led him and his " financial man " Sutton, to test the truth of the glowing statements made by Morgan and Glass, but it did not. They fell easily into the trap which was set, with some skill and some effrontery, for them; but their neglect, or want of prudence, cannot justify the falsehood or fraud of those who practiced upon their credulity. The doctrine of contributory negligence cannot be invoked by the defendants to save them from liability for mis-

leading their victim. They must stand or fall on the truth, and good faith, of the representations that led to the sale. Was there an active demand for lots on the Morgan farm when Williams was told there was? The master and the learned court both find there was none. Was the railroad company about to remove its shops to that point and build another Altoona there? It is settled that it was not. Did a syndicate of prominent capitalists and railroad men exist that had been formed to secure this farm? No such syndicate existed. Had Morgan been offered by this syndicate or by any one on its behalf seventy-five thousand dollars for the farm? He had not. Let us suppose the fact to be, as the master supposes, that Morgan was misled by rumors of an intended removal of the shops and entertained an expectation that it might be done; how could he be deceived about a demand on him for lots or an offer made to him by the alleged syndicate? These statements were false. He knew they were false. He made them to deceive Williams and secure a purchaser. He accomplished his purpose. He inflamed the expectations and quickened the action of his dupe; but it is against equity that an advantage so obtained shall be enjoyed, and the person who has been wronged left without a remedy.

We think the learned judge was right in his view of this case, and his decree, so far as it relates to the rescission of the contract, the return of the money paid and the cancellation of the mortgage, is affirmed. For his gross carelessness the plaintiff ought to lose his costs. No bill of costs will be taxed for the plaintiff.