## Miller *v.* Fulmer, Appellant.

*False representations—Fraud—Declaration of intention.*

A false statement to be deemed fraudulent in law must relate to something represented as a fact existing either in the past or in the present. Neither a declaration of an intention not really entertained, nor a promise made with no intention of performance is of itself a fraud that will vitiate a contract.

Expressions of purpose, promises and predictions, that fail of realization, are fraudulent in law only when they are connected with misrepresentations respecting alleged facts, or falsely hold out a prospect of collateral advantages that leads the vendor to accept a price greatly below the real value of the property parted with.

*Equity—Specific performance—Vendor and vendee—False representations —Fraud.*

A declaration by a purchaser of property that he intends to use it for a particular purpose, while secretly intending to transfer it to another, is not in itself a fraudulent misrepresentation ; but where the misrepresentation is a part of a larger scheme, dependent for its accomplishment on the bad faith, deceit and trickery on the part of the purchaser and the person to whom he intends to transfer the property, equity will not help the purchaser to the specific performance of the contract.

Argued Oct. 27, 1903.    Appeals, Nos. 213 and 214, Oct. T.,

1902, by H. A. Fulmer and B. F. Fink, from decree of C. P. Huntingdon Co., Sept. T., 1901, No. 96, on bill and cross bill in equity in suit of C. Herbert Miller v. H. A. Fulmer and B. F. Fink. Before RICE, P. J., BEAVER, ORLADY, SMITH, MORRISON and HENDERSON, JJ. Decree on bill reversed. Decree on cross-bill affirmed.

Bill in equity for the cancelation of a contract for the conveyance of land.

Cross bill for specific performance of a contract of the sale of land.

The case was heard on bill and answer, cross bill and answer, and proofs.

The facts appear by the opinion of GORDON, P. J., specially presiding, which was as follows :

### FINDINGS OF FACT.

1. During and prior to the year 1901, C. Herbert Miller, the complainant, and B. F. Fink, one of the respondents, were engaged in the hardware business in the borough of Huntingdon, Pa., and were competitors therein.

2. That by deed, dated March 8, 1901, said Miller purchased from Mrs. Kate Blair, a lot in said borough, described in paragraph three of the bill, upon which he subsequently erected a store building, removed his store thereto, and thereafter conducted therein his hardware business, she, the said Mrs. Blair, owning additional land from which said lot was purchased. That prior to March 1, 1901, said Miller arranged with the Pennsylvania Railroad Company for the purchase of a lot adjoining said first mentioned lot on the south, and subsequently received deed for the same dated April 2, 1901, for the purpose of using the same in connection with his said business.

3. By agreement, in the form of a receipt, dated March 29, 1901, said Miller agreed to sell to said H. A. Fulmer, the other respondent, the rear portion of the lot purchased by him from the railroad company, for the sum of $575, on account of which $10.00 were paid and therein acknowledged, and the balance of the purchase money was afterwards tendered to Miller and refused by him. Said lot was purchased by Fulmer for Fink, and the agreement, on the day of its execution, was

assigned and transferred to him. Said agreement is the one sought to be rescinded and canceled by this bill.

4. That on the same day—March 28, 1901—said Fulmer, by deed, purchased from said Mrs. Blair, for said Fink, the balance of said lot owned by her and assigned and transferred the same to him, he having furnished the consideration money for both purchases.

5. That subsequently said Fink commenced the erection and construction of a building upon said lots, to be used by him in the conduct of the hardware business in which he was engaged, the pending injunction having been issued when he extended said building upon Miller lot. That he has expended a considerable sum of money in the erection of said building on the lot purchased from Mrs. Blair, and if he fails to secure the title to the Miller lot agreed to be sold as aforesaid, he will suffer great and irreparable injury.

6. That the making and execution by Miller of said agreement of March 29, 1901, were induced by fraud and deception practiced upon him by the respondents, in pursuance of a conspiracy entered into between them at the instance of said Fink. Prior to the purchases by said Fulmer as aforesaid, said Fink endeavored to purchase the said balance of the Mrs. Blair lot from her, and through Messrs. Africa and Thompson, her agents, and she refused to sell to him because he was a competitor of said Miller in the hardware business. She was interested in the welfare of said Miller because he had purchased the lot from her and was her relative—a nephew, and on that account, and to avoid the establishment of a competing business in the neighborhood, she refused to entertain any proposition from Fink to sell to him, and her agents so informed him. Thereupon said Fink resolved to secure the purchase of said lot by resort to a trick or artifice. To that end he secured the services of said Fulmer, through Charles L. Brown & Company, of Philadelphia, his employers. Fulmer came to Huntingdon in pursuance of his employment. He represented to both Miller and the agents of Mrs. Blair, that he was purchasing the lots for the purpose of engaging in the wood and willowware business exclusively, and said to the latter that he was not purchasing for Fink and did not know him. Complainant and Mrs. Blair, relying upon the truthfulness of these represen-

tations, were induced to agree to sell the lots. The represen-
tations were false. Instead of the purchases being for Fulmer,
and made for the purpose of enabling him to embark in the
wood and willow-ware business, they were made for Fink and
to enable him to secure a location for a building for his hard-
ware business adjoining and in competition with the business
of said Miller. Fink paid Fulmer for his services and ex-
penses in purchasing the lots, and furnished the funds with
which the purchase money was paid. Procuring the title to
the lots thus by deception from Miller and Mrs. Blair evi-
denced a conspiracy between Fulmer and Fink, and was a
fraud as before stated.

### FINDINGS OF LAW.

1. Fraud vitiates and makes null and void everything into
which it enters.

2. While one person in dealing with another, may, with
impunity, by fair and straightforward dealing, by his skill or
superior knowledge and ability, overreach and secure an advan-
tage from another, he may not do so by a trick or artifice. He
is not always required to speak, but when he does so he is ex-
pected to confine himself to the truth, and those dealing with
him may rely upon his doing so.

3. A contract for the purchase of real estate secured by
misrepresentations and fraud is voidable on the part of the in-
nocent party to it.

### CONCLUSIONS FROM FINDINGS.

1. From the foregoing findings of fact and law the conclusion
follows, that the agreement of March 29, 1901, is voidable as
to the complainant, and he having, with due promptness, elected
to avoid it, his prayer for its rescission and cancelation must be
granted.

2. For the same reasons respondent's prayer in cross bill for
specific performance of said contract must be refused. The
injury which will be sustained by said Fink by reason of the
decrees which will be made herein being the result of his own
wrongful acts must be borne by him.

3. Decree will be made and herewith filed in accordance with
the foregoing conclusions.

*Error assigned* was the decree entered in accordance with the opinion of the court.

*Hayes H. Waite*, and *H. B. Dunn*, for appellants.—We submit that under this testimony Mr. Miller shows no reason in equity why he should not be compelled to make a deed for this property: Williams v. Kerr, 152 Pa. 560; Scott v. Schiner, 27 N. J. Eq. 185; Lynch's App., 97 Pa. 349; Graham v. Pancoast, 30 Pa. 89; Noel v. Horton, 50 Iowa, 687; Pettebone v. Beardslee, 3 Kulp, 406; Consolidated Oil Well Packer Co. v. Jarecki Mfg. Co., 157 Pa. 342; Hamilton·v. Hamilton, 4 Pa. 193; Chapman v. Chapman, 59 Pa. 214; Miners' Nat. Bank v. Pottsville Water Co., 3 Foster, 48.

*J. D. Dorris* and *A. O. Furst*, for appellee.—Equity has plenary jurisdiction in cases of fraud though there may be a remedy at law: Ressler v. Witmer, 1 Pearson, 174; Gandolfo v. Hood, 1 Pearson, 269; Fowler's Appeal, 87 Pa. 449.

A party will not be permitted to retain a benefit acquired by his own fraud: Painter v. Harbaugh, 25 Pittsburg L. J. 49; Montgomery Web v. Dienelt, 133 Pa. 585.

If there is unfairness, as if a party contracts to purchase from another apparently for himself, but in reality for a third person, and thereby gains some advantage, equity will withhold its assistance to enforce contract: O'Herlihy v. Hedges, 1 Sch. & Lef. 123; Phillips v. Duke of Bucks, 1 Vern. 227–229.

So long as a contract continues executory, it may not only be impeached for fraud or mistake, but any validity which would be a defense at law, would in general be ground for cancelation in equity: Nace v. Boyer et al., 30 Pa. 99.

Where a vendor is induced to make the sale by misrepresentations of the purchasor in respect to the material facts peculiarly within the knowledge of the latter by which the seller is deceived to his injury, the sale is void: Land & Imp. Co. v. Mendinhall, 4 Pa. Superior Ct. 398; Smith, Kilne & French Co. v. Smith, 36 W. N. C. 124; Bughman v. Central Bank, 33 W. N. C. 557; Braunschweiger v. Waits, 179 Pa. 47; Brown v. Eccles, 2 Pa. Superior Ct. 192.

Opinion by Smith, J., May 11, 1904:

If these cases turned merely on what took place between

Miller and Fulmer, relative to the lot in question, it is clear that Miller would have no ground for seeking to avoid his contract. The false representations by Fulmer were wholly of a promissory nature, respecting his intended use of the property. He alleged nothing as a fact, past or present. He held no relation of trust or confidence toward Miller; exercised no influence or constraint that affected his free agency; and it is not pretended that there was any mental weakness on the part of Miller, of which Fulmer took advantage. There is no allegation that the contract does not express the actual agreement of the parties; that anything was omitted through fraud, accident or mistake, to the prejudice of Miller; that Miller was ignorant of its contents or its effect; or that there was anything in the nature of surprise or haste in its execution. It does not appear that the bargain was an unconscionable one in Fulmer's favor, nor is this alleged in Miller's bill, or in his answer to the bill of Fulmer and Fink. Thus the principal grounds on which a contract is voidable in equity are absent. While fraud is set up as the ground of avoidance, the only matter alleged as fraud is that Fulmer represented that he intended to use the property for a wholesale wood and willowware establishment, while secretly intending to transfer it to Fink. But a false statement, to be deemed fraudulent in law, must relate to something represented as a fact existing either in the past or the present. Neither a declaration of an intention not really entertained, or a promise made with no intention of performance, is of itself a fraud that will vitiate a contract: Smith v. Smith, 21 Pa. 367; Backentoss v. Speicher, 31 Pa. 324; Grove v. Hodges, 55 Pa. 504. Expressions of purpose, promises, and predictions, that fail of realization, are fraudulent in law only when they are connected with misrepresentations respecting alleged facts, or falsely hold out a prospect of collateral advantages that leads the vendor to accept a price greatly below the real value of the property parted with, as in Williams v. Kerr, 152 Pa. 560, or the vendee to pay a price far above its real value, as in Sutton v. Morgan, 158 Pa. 204. In Grove v. Hodges, supra, an attempt was made to impeach the grant of a right to take iron ore, executed nine years previously, on the ground that the grantee's agent, during the negotiations, had said to the grantor that a furnace would

be built in a year, or at most in two years, and designated the
places for their erection; that the grant was executed with this
understanding ; and that no furnace had been built and no ore
taken out.    The Supreme Court said : "It would be going
very far to hold that a man may be relieved from his deed by
proof that when it was made promises were held out to him
that were not performed.    Fraud, it is true, avoids all contracts,
but fraud consists in representations of things as facts which
are not such, or in deceitful concealment of existing facts,
neither of which is found in the evidence.    The conveyance
was not upon condition that furnaces should be built.    If void,
then it must be that deceit was practiced before it was made or
at the time of its execution.    But a promise is not, of itself, a
false and deceitful representation.    Performance may have
been intended when the promise was made.    If so, then there
was no wrong done when the title passed out of the grantor,
and certainly a failure to perform the promise cannot revest a
title after it has been divested.    We agree with the learned
judge of the common pleas that there was nothing in the evi-
dence either to affect the construction of the contract, or from
which the jury could find fraud to avoid it."    In that case
there was nothing to indicate whether the grantee intended to
build furnaces or not, beyond the fact that for nine years he
had made no movement in that direction.    But whether an ex-
pressed purpose is real or simulated, the injury arising from
failure of execution is the same, and there is no substantial
basis for distinguishing, as to legal effect, between an actual
and a feigned purpose, or for holding that fraud is involved or
implied in the failure to carry out an expressed intention.
That a declaration of purpose must be made good, in the ab-
sence of any stipulation respecting it, on pain of being held
fraudulent, is a proposition resting on neither reason nor author-
ity.    In all that took place between Miller and Fulmer, there
was nothing that legally bound Fulmer to carry out his ex-
pressed purpose in buying, and nothing that was a legal bar
to his abandonment of any purpose he may have entertained.

It clearly appears, however, that the purchase from Miller
was but part of a larger scheme, depending for its accomplish-
ment on bad faith, deceit and trickery on the part of Fulmer
and Fink.    The lot mentioned in the contract was in rear of a

lot which Fink had tried to buy of Mrs. Blair, Miller's aunt, but which she had refused to sell to him, for the reason that he was a business competitor of Miller, to whom she had recently sold an adjoining lot. While it does not appear that the ground of this refusal was directly communicated to Fink, it cannot well be doubted, in view of all the circumstances, that he understood it. He shortly afterward employed Fulmer, a stranger to all the parties, to negotiate for the Blair lot as if wishing to purchase for himself; and after several interviews with Africa and Thompson, Mrs. Blair's agents, they agreed to sell to him. In these negotiations Fulmer repeatedly represented that his purpose in buying was to open a wholesale wood and willow-ware establishment; and the evident advantage of this to the business of the town led Mrs. Blair and her agents to consent to the sale. It appears, indeed, that Africa and Thompson suspected that Fulmer was secretly buying for Fink; and when the price had been fixed, one of them drew up an agreement, setting forth in substance, as one of the conditions of sale, that Fulmer was purchasing the lot for his own use, on which to conduct a wholesale wood and willow-ware business, with a view to having him sign it. Showing this to Fulmer, they told him that they would not sell to Fink, nor to him if he had any connection with Fink, and that if he was buying for Fink the deal would be off. They decided, however, not to require him to sign this, but said that they would take his word respecting his purpose in buying and that he had no connection with Fink. Fulmer at once gave his word to this effect, and added that he did not know Fink. Upon this assurance they closed the contract. As they were about concluding it, Africa suggested to Fulmer the purchase of the lot here in controversy as a desirable addition to the Blair lot, and opened communication with Miller by telephone, advising him to sell. Later in the day Fulmer called on Miller and broached the subject, repeating to him the representations he had made to Africa and Thompson respecting his purpose in buying. While Miller, during their negotiations, made no reference to Fink, and apparently had no suspicion of Fulmer's real design, it is impossible, under all the circumstances, to doubt Fulmer's knowledge that Miller would have refused to sell had he known that the property

would pass at once to his business rival. Miller was then ne-
gotiating for the purchase of some land, of which the lot in
controversy formed part. After a full discussion of the sub-
ject with Fulmer, Miller, apparently anticipating an indirect
benefit from the business which he was led to believe that Ful-
mer was about to establish, gave the latter a written declara-
tion of his willingness to sell him the lot if successful in pur-
chasing, but without naming a price. This was on March 1.
On the 28th Fulmer received a deed for the Blair lot, Fink
furnishing the purchase money. On the 29th he received the
contract for the Miller lot which forms the subject of the
present suits. Later, he transferred this contract to Fink and
conveyed to him the Blair lot. From the testimony of Fulmer
and Fink there is apparently no intention of opening a whole-
sale wood and willow-ware establishment on either of these
lots, and Fulmer, by parting with his interest, has placed it
out of his power to do this.

The allegation of a conspiracy between Fulmer and Fink to
obtain the property for Fink by the methods described is not
material in law. With respect to a civil action, when two or
more engage in a tort, their concert of action, though having the
aspect of a conspiracy, is not an essential element of the case,
and its effect is merely to make them joint wrongdoers. The
gravamen of the action is the injury done to the plaintiff:
Laverty v. Vanarsdale, 65 Pa. 507. In those cases the mate-
rial question is whether the plaintiff has suffered an action-
able wrong, through the acts of the defendants, for which he is
entitled to redress.

Here Miller, through a subterfuge on the part of Fulmer
and Fink, was inveigled into a contract which he could not
have been led to make had he known its real design, the
artifice resorted to for the purpose being concealed through
falsehood and deceit verging on legal culpability. While the
falsehood employed in the transaction may be viewed in the
nature of a gratis dictum, not to be taken seriously unless
made a contractual stipulation; as the venial lie of commerce,
and not the mortal lie of fraud in law, fatal to the contract
which it infects; presenting no legal ground for avoiding the
agreement of the parties; it may be considered by a court of
equity where conscience and good faith may sway as the bal-

ancing cast.   Therefore, while the contract here may not be impeached at law, equity affords a measure of relief from it, since it has not been executed by a conveyance.   Specific performance is not of right, but of grace.   It does not necessarily follow that because a contract is binding at law, equity will enforce its performance.   There are contracts which, when executed, equity will not rescind, but which, while executory, equity will not lend its aid to enforce : Graham v. Pancoast, 30 Pa. 89 ;  Henderson v. Hays, 2 Watts, 148.   No specific rule can be laid down for the determination of such cases, but each must be decided in view of its circumstances, and of the equities involved.   Here Miller has undeniably been prejudiced through the device employed to mislead him ; and it cannot be said that Fulmer and Fink are in court with clean hands, or that they have done equity in the premises.   Notwithstanding this they now invoke the aid of a court of equity to consummate their scheme.   Whatever may be said in a court of law of the pretenses here employed, the conduct of the defendants was marked by a degree of guile sufficient to bar the interposition of equity in furtherance of their design.   The case is one in which a court of equity will not interfere either to rescind or enforce the contract, but will leave the parties to their remedies at law.

In the case of Miller v. Fulmer and Fink, the decree directing cancelation of the contract is reversed and the bill dismissed.   In the case of Fulmer and Fink v. Miller, the decree refusing specific performance is affirmed and the bill dismissed, without prejudice to the right of the plaintiffs to proceed at law.   Each party to pay his own costs.