369 A.2d 1172

**BRENTWATER HOMES, INC., Appellant,**

v.

**Richard W. WEIBLEY and Kathryn S.
Weibley, Appellees.**

Supreme Court of Pennsylvania.

Argued Jan. 14, 1976.

Decided Feb. 18, 1977.

Decided Feb. 28, 1977.

Myers, Myers, Flower & Johnson, Thomas I. Myers, Lemoyne, for appellant.

McNees, Wallace & Nurick, G. Thomas Miller, Harrisburg, for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

This is an action in equity brought by appellant to compel specific enforcement of a contract for the sale of land to appellant by appellees. After a hearing, the chancellor entered a decree *nisi* declaring the contract unenforceable because of the fraud and unclean hands of plaintiff, the vendee. The decree denied specific per-

formance and directed the vendor to return the down payment. The plaintiff's exceptions to the adjudication were dismissed and the decree *nisi* made final. This appeal followed.[1] We will affirm.

The record discloses the following essentially undisputed facts. In 1969 Mr. W. R. Keeley was the president and owner of all of the capital stock of Keeley Realty Company and Brentwater Homes, Inc., corporations with offices in Camp Hill, Cumberland County, Pennsylvania. He was also president of Pennsboro Homes, Inc., a wholly owned subsidiary of Keeley Realty Company. In the spring of that year Keeley undertook to acquire land in Hampden Township, Cumberland County for the development of a planned community to be known as the "Village of Westover". To this end he introduced himself to Richard W. Weibley, one of the appellees. Mr. Weibley and his wife, Kathryn, owned a stone farmhouse on Skyport Road in Hampden Township built during the colonial period; his mother, Lucy G. Weibley, owned an adjacent tract of land of 109 acres. Mr. Keeley indicated to Mr. Weibley that he intended to develop the land, if acquired, as part of his projected "colonial village", and he further indicated that the Weibleys' colonial farmhouse would be a focal point of the proposed village. Mr. Weibley became interested in the planned colonial village, and on behalf of his mother entered into negotiations with Mr. Keeley for the sale of the 109 acre tract. The result was a written agreement, dated April 24, 1969, by which Mrs. Lucy Weibley contracted to sell her land to Pennsboro Homes, Inc.[2]

1. See Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, Art. II, § 202, 17 P.S. § 211.202. This appeal was filed March 13, 1975, prior to transfer of appellate jurisdiction in equity cases to the Superior Court. See Pa.R.A.P. 702 (superseding Supreme Court Rule 73, effective April 17, 1975).

2. Richard W. Weibley and his wife Kathryn S. Weibley were also parties to this agreement for the purpose of granting to the purchaser a right of first refusal to adjacent property owned by Mrs. Weibley, Sr. and in which the Richard Weibleys owned an undivided interest.

In late June or early July, 1969, after the closing of the transaction above described, Mr. Keeley informed Mr. Weibley that he was interested in obtaining more land for the Westover Village project, and the two entered into negotiations concerning land owned by appellees and located directly across the road from their colonial farmhouse. After two or three meetings between the parties, appellees, by written agreement dated August 2, 1969, contracted to convey on or before April 1, 1970 an unrestricted title to a 4½ acre tract to Brentwater Homes, Inc., the appellant. It is this agreement which is the subject of this litigation.

In the meantime, on July 17, 1969, prior to the execution of this agreement of sale and without the knowledge of the Weibleys, a representative of Brentwater Homes and Mr. Keeley appeared at a public meeting of the Hampden Township Planning Commission, submitted a preliminary plan for Keeley's proposed colonial village development, and requested that the entire area be rezoned from R–2—single family residences—to A–0—office and commercial uses.[3] The tract involved in the present litigation appeared on the map submitted to the Planning Commission with the notations "uses such as medical center nursing home also retiree apts." and "potential high rise site." The Commission gave preliminary approval to Mr. Keeley's plan at this time. In September, 1969, after the execution of the agreement of sale, the Weibleys learned for the first time of the proposed rezoning, and Mr. Weibley spoke in opposition to

---

3. The minutes of the Planning Commission, admitted into evidence, indicate that Mr. Keeley had earlier appeared at a May 15 meeting of the Commission "for an informal discussion of planned development," but there is no indication of precisely what was discussed at this earlier meeting. Contrary to the plan submitted on July 17, the chancellor erroneously found that "only that portion of the plans relating to Defendants' tract required [sic] development of structures other than single family dwellings." Such other uses were indicated on other portions of the development as well.

the rezoning in public hearings on the subject. Nevertheless, in November, 1969, the Hampden Township Commissioners rezoned the area to permit the proposed development. When, shortly prior to the date for closing the sale transaction, Mr. Keeley expressed readiness to close on behalf of Brentwater Homes, Inc., the Weibleys refused to do so except on condition that restrictions be inserted in the deed which would have limited the use of the property to single houses of a stated value and would have had the effect of maintaining in force the zoning classifications existing at the date of the contract. These conditions were unacceptable to Keeley, who also refused to rescind the sale agreement. This action was then commenced by Brentwater Homes.

The defense of the Weibleys to this action was that they had been induced by Brentwater Homes' agent, Mr. Keeley, to sign the contract of sale by representations that the real estate to be conveyed would be developed as a single family, "high class" residential community and that these representations were in fact false and fraudulent when made. The chancellor held that this defense had been made out. The only question for determination on this appeal is whether the evidence supports the chancellor's conclusion. We hold that it does.

It is well settled that an appellate court is bound by the chancellor's findings of fact, approved by a court en banc, to the same extent as it would be bound by the findings of a jury. The test in either case is whether the findings are adequately supported by the record and whether the factual inferences and legal conclusions based on the findings are correct. *Charles v. Henry,* 460 Pa. 673, 679, 334 A.2d 289, 292 (1975). Where credibility of the witnesses is important, the chancellor's findings are entitled to particular weight because of the opportunity which was his to observe the demeanor of witnesses on the stand. *Charles v. Henry, supra.* See also *Dozor*

*Agency, Inc. v. Rosenberg*, 431 Pa. 321, 323, 246 A.2d 330, 331 (1968).

The chancellor found as facts that throughout the negotiations for the sale of Mrs. Lucy Weibley's 109 acre tract, the Richard Weibleys evidenced a substantial interest in the developer's plans for Mrs. Weibley Sr.'s property and in preserving the value of their own colonial farm house; that Mr. Keeley assured the Weibleys that "he was not interested in erecting multi-family units, and further, that his expansion of the adjacent tract, the village of Westover, would be of colonial, single family homes designed to highlight the farmhouse"; that the appellant's plans relating to the appellees' own property, as submitted to and approved by the Hampden Township Planning Commission, in fact "required development of structures other than single family dwellings, *e. g.*, a medical center, a nursing home, apartments, and a high-rise structure"; that the approval of these plans required a change in zoning of the area from single family dwellings, which was accomplished, over appellees' objections; that the Weibleys would not have entered into the agreement with Brentwater Homes had they known of such plans, and that this was the reason they refused to consummate the agreement and demanded rescission. In his adjudication the chancellor characterized Richard Weibley's testimony concerning Mr. Keeley's assurances as "credible, convincing, distinct and detailed," and concluded as a matter of law that Keeley had induced the appellees to enter into the contract of sale "by fraudulently assuring them that he had plans to erect only single family homes on the tract", and that the contract was therefore voidable by the Weibleys.[4]

4. As an alternative ground, the chancellor also found that the appellant's petition to the Hampden Township Planning Commission was "in effect a misrepresentation of interest with respect to that portion of the petition relating to defendants' tract" and that, therefore, the appellant had "unclean hands, making this an inap-

This Court has defined the nature of the parol evidence which is sufficient to render a written agreement invalid because of fraud in these terms:

"Fraud is composed of a misrepresentation fraudulently uttered with the intent to induce the action undertaken in reliance upon it, to the damage of its victim. *Edelson v. Bernstein*, 382 Pa. 392, 115 A.2d 382 (1955); *Neuman v. Corn Exchange National Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 759 (1947). To sustain the conclusion of the court below, evidence of . . . fraud must be clear, precise and convincing. *Aliquippa National Bank v. Harvey*, 340 Pa. 223, 16 A.2d 409 (1940); *Pennsylvania R.R. Co. v. Shay*, 82 Pa. 198 (1876). The test is met where the witnesses depended upon to prove fraud distinctly remember the facts to which they testify and narrate the details with specificity. *Broida v. Travelers Insurance Co.*, 316 Pa. 444, 447, 448, 175 A. 492, 494 (1934); *Ralston v. Philadelphia Rapid Transit Co.*, 267 Pa. 257, 269, 110 A. 329, 333 (1920)." *Thomas v. Seaman*, 451 Pa. 347, 350–51, 304 A.2d 134, 137 (1973).

■■ A statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of a fact. See, *e. g.*, *Thomas v. Seaman, supra.* Furthermore, it is well settled that a material misrepresentation of the use to which property will be put by the buyer, even if the consideration given is otherwise fair, may be ground for rescinding a contract for the sale of land as fraudulent. *Williams v. Kerr*, 152 Pa. 560, 25 A. 618 (1893). *See generally* Annotation, "Purchaser's Misrepresentations as to Intended Use of Real Property as Ground for Vendor's Equitable Relief from Contract and Deed," 35 A.L.R.3d 1369 (1971).

propriate case for equitable relief." Because we are affirming the chancellor's holding that the contract is unenforceable against the Weibleys because of fraud, we need not deal with the unclean hands aspect of the case.

24

■ Our review of the record in the case at bar satisfies us that appellees met their burden of establishing fraud with evidence that was sufficiently clear, precise and convincing. The following testimony by Richard Weibley adequately supports the finding that Mr. Keeley intentionally misled the Weibleys as to the uses he intended to make of their property:

"Q. Now when you initially started negotiating with Mr. Keeley for the purchase of this tract of land from your mother, did you ask him what he intended to do with the land?

A. Yes, I never knew Mr. Keeley in person until the day he entered my office and introduced himself, we greeted each other and he said he was there to talk to me about the purchase of the ground across from the airport which was owned by my mother. I asked him, I said are you interested in building apartments and he said no, I am interested in building a colonial type village. Well, myself being interested in colonialism [sic] I was interested in talking to him about such a village.

Q. Then you asked him specifically if he were interested in building apartments?

A. That is right."

Continuing his testimony, Weibley stated that when Mr. Keeley opened negotiations with Mr. and Mrs. Weibley for the purchase of the land owned by them, "he would like to continue the building of the Westover planned village, planned homes in that area, he knew of my objection to any apartments from the very time he started talking." Mr. Weibley was then asked, "did you again ask him if he planned to build apartments or anything other than single family homes?" and gave the following answer: "Yes, I asked him about the apartments and he said he was going to continue building single family

homes." It is clear, furthermore, and the chancellor found, that during the time the agreement for the sale of the appellees' land was being negotiated but before it was executed, Mr. Keeley entertained definite plans to use the land for such structures as a medical center, a nursing home, apartments and a high-rise structure; in July of 1969, a planner employed by Brentwater Homes appeared before the local Planning Commission with proposals to rezone the land in that area to permit such uses. Accepting the Weibley version of the above conversations, as the trial court did, these plans and proposals by appellant were duplicitous.

Although some testimony in the record arguably supports Brentwater Home's argument that Mr. Keeley did not, at least during the negotiations for *this* parcel of land, represent to the Weibleys that he would build only single homes on their property, there was sufficient evidence for the chancellor to find that misrepresentations were made by the appellant, that they were fraudulent in the circumstances and that they were the inducement to the contract. The two purchases of land, one by appellant Brentwater Homes and the other by its affiliate Pennsboro Homes, from members of the Weibley family were essentially a continuum, the negotiations for both being handled by the same two persons—Mr. Keeley for the vendees and Mr. Weibley for the vendors. The statements made in connection with the first transaction were germane to the second. Resolution of the conflicts which undeniably were present in the testimony depended on the chancellor's assessment of the credibility of the witnesses before him. Having found fraudulent misrepresentation to have been made, the trial judge properly concluded that the contract was voidable and unenforceable as against appellees. We find neither abuse of discretion nor error of law in his decision.

Decree affirmed. Costs on appellant.

EAGEN, J., filed a concurring and dissenting opinion.

MANDERINO, J., filed a dissenting opinion.

EAGEN, Justice (concurring and dissenting).

I am unable to agree with Mr. Justice Pomeroy that appellees have met their burden of establishing fraud with evidence that is sufficiently clear, precise, and convincing.

The record does not support the chancellor's finding that Mr. Keeley assured appellees that he planned to build *only* single-family homes on the tract in question. Neither Mr. nor Mrs. Weibley testified to this clearly and unequivocally, although both were given opportunities to do so. For example:

[Mr. Weibley, on cross-examination]

"Q. Did Mr. Keeley ever promise you that he was going to build only single family residences?

"A. He said he was planning to build single family houses, yes.

"Q. Did he ever promise you that was all he was going to build?

"A. That is all we ever discussed was single dwelling homes.

"Q. That is all you ever discussed?

"A. Yes."

[Mrs. Weibley, on direct]

"Q. With reference to the occasion when the sale was being discussed did Mr. Keeley make any statement as to the plans he was then making for the use of this property if he could buy it from you?

"A. No, what he was planning to do with it?

"Q. With the tract, yes?

"A. No, I just assumed that it was single family dwelling houses, he talked about homes, if that is what you mean."

Mr. Weibley did testify that when Mr. Keeley originally came to see him about his mother's property, "I asked him, I said are you interested in building apartments and he said no, I am interested in building a colonial type village." Although Mr. Keeley's indication that he was not "interested in building apartments" appears to have misled Mr. Weibley about the nature of the proposed "colonial type village," I cannot find in the context in which it was given that it was either a misrepresentation or uttered with the intent to deceive. The record suggests that Mr. Keeley's "interest" was not in building apartments per se, but in building a planned community in an integrated colonial style which would include a multitude of contemporary uses—including both apartments and detached homes—all encompassed within the overall concept of a "colonial type village." [1] Although Mr. Weibley testified that he and Mr. Keeley used Williamsburg "as a general theme" in discussing the proposed colonial village, he conceded on cross-examination that the colonial style is not confined to single-family detached residences. Nor, I might add, is a village.[2] Moreover, even were I to regard this statement about Mr. Keeley's "interest" a misrepresentation of his intention with respect to his "village," it was not made in connection with the transaction in question, but with the earlier one involving Mr. Weibley's mother's land, upon which single-family homes were indeed to be built. In order to support their argument that there was fraudulent misrepresentation, appellees rely on the plan Mr. Keeley submitted to the Planning Commission on July 17 showing an intention to build

1. As for the indication on the July 17 plan that part of the tract in question was a "potential high rise site," Mr. Keeley testified: "I don't think we plan to put a high rise apartment because I am not sure that a high rise belongs in a suburban area." He also stated: "I will say it was my intention to have this subject tract of ground as being a part of the colonial village, I am not saying I planned to do something entirely different with it."

2. But see *Incorporation of Borough of Edgewood*, 130 Pa. 348, 351, 18 A. 646 (1889).

apartments on the tract in question, but their evidence that they relied on his contemporaneous misrepresentations with regard to this tract is far from clear and convincing.

At one point Mr. Weibley did testify that he asked Mr. Keeley whether he planned to build apartments on this tract and that Mr. Keeley indicated his intention "to continue building single family homes":

"Q. Now in the course of these negotiations did he tell you what plans he was making for the use of that ground if he acquired it?

"A. Well, he said he would like to continue the building of the Westover planned village, planned homes in that area, he knew of my objection to any apartments from the very time he started talking.

"Q. Did you again ask him if he planned to build apartments or anything other than single family homes?

"A. Yes, I asked him about the apartments and he said he was going to continue building single family homes."

At a subsequent point in his direct testimony, however, Mr. Weibley contradicted himself:

"Q. What were you relying on when you did enter the agreement?

"A. *On his original word when he introduced himself* and he was interested in building a colonial village of single residence homes and *I have relied on his word and never questioned him about that since.*" [Emphasis added.]

Thus, his testimony clearly established at most that he relied upon Mr. Keeley's original statements that he was not "interested" in building apartments and that he in-

tended to build single-family colonial-style homes on the land he hoped to obtain from Mr. Weibley's mother. The record indicates that these representations could not have been made later than April 24, the date of the first agreement of sale and well before the plan was submitted on July 17, and that single-family homes were indicated on the plan and indeed constructed adjacent to the Weibley farmhouse on the tract which had formerly been owned by the senior Mrs. Weibley.[3] The testimony of his wife was no clearer in establishing fraudulent misrepresentation as to the intended use of the tract in question. Mrs. Weibley testified that Mr. Keeley stated to her mother-in-law in her presence that he was not going to build apartments on the first tract, but her testimony about the negotiations over the second tract was vague and unclear:

"Q. With reference to the occasion when the sale was being discussed did Mr. Keeley make any statement as to the plans he was then making for the use of this property if he could buy it from you?

\* \* \* \* \* \* \* \*

"A. No, I just assumed that it was single family dwelling houses, he talked about homes, if that is what you mean.

\* \* \* \* \* \* \* \*

"Q. Do you have any specific recollection about it the day it was signed, did Mr. Keeley say anything to you about building single family homes or make plans for single family homes on that day?

"A. I don't think there was too much said, we had talked about selling the ground, I don't remember anything being said about single family residences at that time."

3. There was no evidence presented as to when the plan submitted at the July 17 meeting was drawn up or formulated.

Thus, I conclude that appellees' evidence was insufficient to establish the affirmative defense of fraud.[4]  Cf. *Carlson v. Sherwood*, 416 Pa. 286, 206 A.2d 19 (1965).

The chancellor, however, also held that the contract was not specifically enforceable because Mr. Keeley, by petitioning for rezoning without notice to appellees engaged in a "sharp, albeit legal undertaking designed to frustrate the content of the parties' negotiations."[5]  It is clear that under the unclean hands doctrine a chancellor in equity has the discretionary power to deny affirmative

4.   Appellant advances additional arguments that the record demonstrates its alleged fraud is not "intrinsically probable," such as: (1) Mr. Weibley pointed out and commented favorably upon to Mr. Keeley a magazine article about another planned village which stated: "Like any good village or planned community, there is a variety of housing types available.  Town houses, rental apartments, and single-family houses of either colonial or contemporary design offer a full range of choice."  (2) The agreement of sale for the first tract of land indicates that the parties *removed* restrictions from the property, making it unlikely that appellees expected the second tract to be restricted to single-family homes.  (3) Although he protested the rezoning, Mr. Weibley did not disaffirm the contract on the ground of fraud when he learned of Mr. Keeley's plan in September, and even the following March, rather than accusing Mr. Keeley of fraud, he instead attempted to supplement the agreement with restrictions he drafted himself and was clearly capable of drafting at the time of the agreement had such restrictions then been important to him.  On the other hand, Mr. Weibley testified that he had not read the entire article about Montgomery Village and only discussed it in the context of a picture showing bicycle paths, while the record is unclear about the nature of the restrictions removed from the first tract.  My conclusion that fraud was insufficiently established is based on appellees' evidence alone, rather than upon an attempt to weigh the significance of this additional and generally ambiguous evidence.

5.   The language quoted is from the opinion supporting the final decree.  Appellant argues that the chancellor's finding of bad faith with regard to the rezoning petition was influenced by his erroneous assumption that, although Mr. Keeley had petitioned for area-wide rezoning rather than for a variance, the "design and effect" was that of a petition for a variance, and it was thus "a misrepresentation of interest" to the Planning Commission since the agreement of sale had not yet been made.  Although the chancellor did take this approach in his adjudication, his final opinion recognized the legal validity of appellant's petition and clearly based the finding of unclean hands not on the petition itself but the context in which the petition was presented.

relief to a party whose conduct toward the party from whom relief is sought has, in the matter in litigation, been willfully inequitable. See, e. g., *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968); *Shapiro v. Shapiro*, 415 Pa. 503, 204 A.2d 266 (1964). Moreover, even where the conduct of the party seeking to enforce a contract for the sale of land has not been willfully inequitable and the contract itself is not susceptible to rescission, a chancellor may in his discretion deny specific enforcement if he reasonably determines that such enforcement would be inequitable. In *Payne v. Clark*, 409 Pa. 557, 561, 187 A.2d 769, 771 (1963), we stated that specific performance "should only be granted where the facts clearly establish the plaintiff's right thereto; where no adequate remedy at law exists; and, where the chancellor believes that justice requires it." See also *Snow v. Corsica Construction Co., Inc.*, 459 Pa. 528, 329 A.2d 887 (1974). In the circumstances of this case, although I conclude that the evidence is insufficient to sustain the chancellor's finding of fraud, I cannot conclude that the chancellor abused his discretion in denying specific performance.

As I have indicated, the evidence is unclear that, contemporaneously with the submission of his plan indicating his intention to build apartments on the land in question, Mr. Keeley was assuring appellees that he intended to build single-family homes on it. The evidence, however, does support the conclusion that, in connection with the negotiations over the prior sale of land, Mr. Keeley, whether intentionally or not, led the Weibleys to believe that his proposed colonial village would consist solely of single-family homes, and that they indicated to him their objections to having apartments constructed in the vicinity of their colonial farmhouse. Although a mere allegation that a party would not have entered into a contract had he known the truth may not be sufficient to show the materiality of a representation—see *Hirsch v. Silber-*

*stein,* 424 Pa. 486, 227 A.2d 638 (1967)—the record here clearly suggests not only that the Weibleys would not have entered into the agreement had they known that apartments would be built on the land, but that the prospect of having their own home the focal point of a "village" of colonial homes was a strong inducement for them to enter into it. Although the sale of the senior Mrs. Weibley's land was a separate transaction from the one in question, that a certain continuity between them was presumed is evident from Mr. Keeley's statement that he wanted to acquire the instant property for the continuation of his village. Since the record indicates that Mr. Keeley did in fact begin to build single-family homes on the first tract conveyed, since the area was then zoned for single-family dwellings, and since Mr. Keeley had previously indicated that he was not interested in building apartments, the Weibleys' assumption that Mr. Keeley's proposed continuation of the village would involve the construction of more single-family homes was reasonable under the circumstances.

This being so, I believe that Mr. Keeley's admitted failure to disclose both his intentions with regard to the second tract and his contemporaneous petition for rezoning, following upon his earlier misleading indication of the nature of the proposed village, though not fraudulent constituted a sufficiently misleading concealment on the part of the buyer to justify the chancellor's refusal to grant specific performance of the contract.[6] Cf. *Schaeffer v. Jones,* 293 Pa. 529, 143 A. 197 (1928); *Brown v. Pitcairn,* 148 Pa. 387, 24 A. 52 (1892); *Miller v. Fulmer,* 25 Pa.Super. 106 (1906). This is the case even though I assume, unlike the chancellor, that Mr. Keeley did not de-

6. I note also that, although the July 17 plan indicated that single-family homes would be built on the portion of the first tract conveyed nearest to the Weibley farmhouse and although single-family homes were in fact built in that area, the plan also indicated that townhouses and garden apartments would be built on this tract further to the south and Mr. Keeley testified that he intended to build them there.

liberately deceive appellees and that, as he testified, he was under the impression that they were aware his proposed village was not limited to single-family homes. See 3 *J. Pomeroy, Equity Jurisprudence* (5th ed. 1941), §§ 889, 905. Accord, *Bowker v. Cunningham,* 78 N.J.Eq. 458, 79 A. 608 (1911).

Therefore, I believe that while the contract was not void because of fraud, the chancellor in an exercise of discretion could, under the circumstances, properly deny specific performance. Nonetheless, the complaining party may still be entitled to damages for breach of contract. In my view, the complaint which prayed for general relief, as well as for specific performance, should have been transferred to the law side of the court for proceedings to determine this question.

MANDERINO, Justice (dissenting).

I dissent from the majority's conclusion that the evidence clearly and convincingly established fraud. In this respect, I agree with the concurring and dissenting opinion of Mr. Justice Eagen. I do not believe, however, that the denial of specific performance was proper. I cannot accept Mr. Justice Eagen's reasoning that, because appellees erroneously assumed that appellant would build only single family dwellings on the tract in question, a "sufficiently misleading concealment . . . to justify the chancellor's refusal to grant specific performance of the contract," has been proved. I fail to see any distinction between "fraud" and "sufficiently misleading concealment." Since, in my opinion, appellees failed to meet their burden of establishing fraud, I would grant the specific performance requested.