BECKER, Circuit Judge,
dissenting.
I agree with the majority’s disposition of the law of the case issue. However, I disagree with the majority’s interpretation and application of the Pennsylvania “gist of the action” jurisprudence, hence this dissent from the judgment. I believe that the majority reads Pennsylvania law too narrowly. I also believe that its abbreviated and antiseptic rendering of the underlying facts belies the true nature and ultimate essence of Ladbrokes’ conduct, which (if proven) would render it liable in tort. I begin with a fuller description of that conduct, from which it will be apparent that the written agreement, on which the majority focuses, is not the central fact of the case but rather a mere instrument of Ladbrokes’ fraudulent scheme.
I.
In June 1999, plaintiff Stuart Williams was approached by Ladbrokes to solicit his interest as a potential buyer for Ladbrokes’ North American gaming businesses. By July 1999, Williams and Alan Ross, representing Ladbrokes, had reached an oral understanding that *388 Williams would purchase several of Ladbrokes’ casinos, betting parlors and racetracks for $120 million cash. They then negotiated the terms of a binding letter of intent. When Ross first met Williams, he had not yet tested the’ market for the properties, but he did not want to preclude a deal with Williams if he was unable to get a higher price elsewhere. Williams insisted that he have the exclusive right to purchase the properties during the period of due diligence and final agreement drafting. Indeed Williams told Ross that he would not spend “one minute” of his time or “one penny” of his money pursuing a transaction unless Ladbrokes intended to deal exclusively with him. Ross did not want exclusivity but, recognizing that Williams would not proceed further without it, he ultimately assured Williams that Ladbrokes would deal exclusively with him; the consideration was a hefty purchase price. Although the assurance of exclusivity was memorialized in the letter of intent and signed by Williams and Ladbrokes, it is clear from the record that Ladbrokes and Ross never intended to provide exclusivity to Williams.
The record is uncontradicted that Ladbrokes and Ross, even as they negotiated specifically with Williams about exclusivity and extracted additional consideration from him in exchange for it, secretly marketed the properties to others. When asked by Williams whether Ladbrokes had engaged or was engaging in such discussions, Ross lied and told Williams “no,” and when asked in his deposition why he had not disclosed his contacts with other potential buyers to Williams, Ross answered, “Why would I?” An internal Ladbrokes memorandum written by Ross stated that he intended merely to “keep [Williams] in the running” while he shopped the properties to third parties.
Moreover, throughout August and September 1999, Ross repeatedly lied to Williams about Williams’s access to due diligence materials, and about the solicitation of offers for the property under agreement with Williams. When Williams told Ross that he was concerned about the continuing delays and excuses, and specifically asked Ross whether Ladbrokes was dealing with others, Ross told Williams, “You don’t have anything to worry about,” and “you’re just overreacting.” But, on July 28, 1999, the same day Ross signed the letter of intent, Ross had sent documents relating to some of the properties to one prospective purchaser and a confidentiality agreement to another. On August 3, Ross met another potential buyer and discussed the possible acquisition of the properties, including purchase price. And on August 5, Ross met and negotiated with two other prospective purchasers. Then, on August 10, Ross met with another interested party, who made an offer. Also that day, another Ladbrokes executive faxed financial statements and other financial information for the Pennsylvania properties to still another potential buyer.
On August 26, 1999, Ladbrokes issued a press release indicating an intent to sell its North American properties, including the businesses covered by the letter of intent. Strikingly, the press release made no mention of Williams or the letter of intent. In response, at least seven more individuals expressed their interest in purchasing some or all of the properties. By the end of August, Ross had sent financial information to another prospective purchaser and offered to meet with him the following week. Over the course of the next week, Ross continued to meet with other possible buyers and received a concrete offer from one of them.
Williams called Ross immediately after becoming aware of the August 26, 1999 *389 press release. Ross told Williams that “the press release really didn’t have anything to do with our transaction.” Ross further told Williams “not to worry, that this transaction was absolutely [his].” Ross also reminded Williams that Ladbrokes’ board had “approved the transaction.” After further conversations, Ladbrokes’ CEO Peter George wrote confirming that Ladbrokes would “not solicit expressions of interest,” would not “negotiate] terms of sale and purchase” with any third parties, and would not give any third parties access to the data room during the period that Williams had access. And yet on September 3, 1999, at about the same time Ross and George were assuring Williams they had not and would not solicit expressions of interest of send financial or legal documents to anyone else, Ross wrote a memo to George stating that Ross intended to “keep [Williams] in the running” while he continued to shop the gaming business.
Throughout September 1999, “the beat went on.” The short of it is that defendants’ repeated lies and misrepresentations were made to string Williams along while Ladbrokes and Ross continued to shop the properties to third parties. As Judge Lee, who preceded Judge Schwab in the case, found in connection with his grant of summary judgment on the issue of the defendant’s breach of their obligation to negotiate in good faith under the letter of intent, “Ross and other Ladbrokes’ officers and employees aggressively shopped around the gaming interests as to which Williams had just been granted exclusivity rights.” This conduct continued even after Ladbrokes finally gave Williams access to the due diligence materials on September 22, 1999. There were further discussions between Ladbrokes and Williams which ultimately imploded when Ladbrokes purchased, at a heavy discount, $54 million in bonds that Williams had expected to assume.
II.
I do not quarrel with the majority’s general statement of the relevant Pennsylvania jurisprudence, i.e., that the “gist of the action” doctrine “is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] precluding] plaintiffs from recasting ordinary breach of contract claims into tort claims,” and that “[t]ort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.” And see Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103-04 (3d Cir.2001) (alteration in original):
[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus
Redevelopment Auth. of Cambria Cty. v. International Ins. Co., 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) (en banc) (quoting Phico Ins. Co. v. Presbyterian Med. Servs. Corp., 444 Pa.Super. 221, 663 A.2d 753, 757 (1995)). In other words, a claim should be limited to a contract claim when “the parties’ obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.” Bash v. Bell Tel. Co., 411 Pa.Super. 347, 601 A.2d 825, 830 (1992).
I do, however, disagree with what I see as a crabbed view of Pennsylvania’s willingness to apply tort principles where the facts show that a party to an alleged contract had a fraudulent intent with respect to its contractual promises. As I read the Pennsylvania cases, where, as here, there *390 was fraudulent intent, i.e. a subjective and undisclosed intent not to perform, a fraud claim is stated.
Let me begin with basic principles. If a party to a contract misrepresents his or her present intention to perform, he or she has committed the tort of misrepresentation. On the other hand, if a party had a present intention to perform but later fails to perform, deliberately or otherwise, the action ordinarily is one for breach of contract, unless the breaching party gives knowingly false assurances of performance, in which case an action for misrepresentation can also lie. See 5 Corbin on Contracts § 1077 at 238 (Supp. Fall 2001) (“If a party attempts to commit fraud, he should not be insulated from liability for punitive damages, just because the means he has chosen for achieving his fraud happen to involve a breach of contract.”). As we held in Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments, 951 F.2d 1399, 1410 (3d Cir.1991), under Pennsylvania law, “ ‘[a] statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact.’ ” (quoting Brentwater Homes, Inc. v. Weibley, 471 Pa. 17, 369 A.2d 1172, 1175 (Pa.1977)) (alteration in original).
My view of the open texture of Pennsylvania law in this area is supported by Jahanshahi v. Centura Development Co. 816 A.2d 1179 (Pa.Super.2003), which applied an analogous misfeasance/nonfeasance analysis. It is also supported by a number of federal district court eases applying Pennsylvania law. See, e.g., Precision Printing Co. v. Unisource Worldwide, Inc., 993 F.Supp. 338, 356 (W.D.Pa.1998) (“[A] promise which the promisor had no intention of keeping at the time he made it may be actionable as fraud.”); Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp., 974 F.Supp. 822, 843 (E.D.Pa.1997) (“ ‘[A] cause of action for fraud can be predicated on future promises if the defendant knew at the time he made the promise that he would not carry it out.’ ”) (quoting Killian v. McCulloch, 850 F.Supp. 1239, 1255 (E.D.Pa., 1994)); Fox’s Foods, Inc. v. Kmart Corp., 870 F.Supp. 599, 609 (M.D.Pa.1994) (holding there was sufficient evidence for a jury to conclude that the defendant did not intend to perform when the promise was made); Ebeling & Reuss, Ltd. v. Swarovski, Int’l, 1992 WL 211554, at *9 (E.D.Pa. August 24, 1992) (“[A] party can be liable for fraud if the party intended not to comply with the terms of the contract at the inception of the contractual relationship.”).
I read the majority opinion as having twin foci. On the one hand, whenever fraudulent misrepresentations to induce a contract result in specific duties outlined in the later contract between sophisticated parties, the majority would bar an action in tort. On the other hand, candidly acknowledging the opaqueness and fluidity of the Pennsylvania gist of the action jurisprudence, the majority really seems to be making an impressionistic judgment as to whether the action sounds in contract or tort. I’ll take it either way. The first focus, I respectfully suggest, is simply wrong as a matter of the history of the gist of the action doctrine. The second, which seems to supply the majority’s ratio decidendi, does not, I submit, square with the facts.
History tells us that sophisticated parties can be duped, especially when, like the late Tug McGraw, they want to believe. The faithless Ross was a master duper. As Judge Lee held, the facts support the conclusion:
That Alan Ross and Ladbrokes deliberately and intentionally deceived plaintiffs and strung them along while shopping their business and properties around to third parties, knowing that plaintiffs would be incurring significant *391 expenses toward due diligence on a deal defendants decided they were not going to consummate.
And as Judge Lee recognized, presented with the facts I have chronicled, a reasonable jury certainly could conclude that Ladbrokes, through Ross, entered into the letter of intent in order to induce Williams to keep his money on the table, with no present intention of honoring its contractual obligations.
The evidence here is overwhelming and uncontradicted. It reflects an egregious fraud, papered over by a contract. It is also a case in which “the parties’ obligations are defined ... by the larger social policies embodied in the law of torts.” Bohler-Uddeholm America, Inc., supra. I believe that Pennsylvania would, on these facts, recognize a tort claim. I would therefore reverse the grant of summary judgment in favor of Ladbrokes (and, a fortiori, of Ross) and remand for a trial on Williams’ fraud claim.